UNITED STATES COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| R. Messac, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO. |
| | ) |
| vs. | ) 02-11883 RGS |
| | ) |
| Commonwealth of Massachusetts, | ) |
| Department of Mental Retardation, | ) |
| Walter E. Fernald Developmental Center, | ) |
| | ) |
| Gerald J. Morrissey, Jr., in his Official | ) |
| Capacity as Commissioner, Department of | ) |
| Mental Retardation, Commonwealth of | ) |
| Massachusetts, | ) |
| | ) |
| Martin J. Benison, in his Official Capacity | ) |
| as Comptroller, Commonwealth of | ) |
| Massachusetts, | ) |
| | ) |
| Defendants. | ) |

FIRST AMENDED COMPLAINT
AS A MATTER OF COURSE AND DEMAND FOR TRIAL BY JURY

Now comes the Plaintiff, R. Messac, by her attorneys, and,

pursuant to Federal Rule of Civil Procedure 15(a), hereby files

her First Amended Complaint As A Matter Of Course and Demand for

Trial by Jury, respectfully Noting that no responsive pleading

within the meaning of Rule 15(a) has been filed with the Court,

nor has Judgment entered in this action. As a matter of law, all

prior Pleadings are deemed withdrawn upon the filing of the said

Amended Pleading. Wilson v. First Houston Investment Corp., 566

F.2d 1235, 1237-38 (5th.Cir.1978); 6 Wright & Miller, Federal

Practice and Procedure: Civil § 1476 (1971); Levitch v. Columbia

UNITED STATES DISTRICT COURT
OF THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2002 OCT 31  P 4: 21

C.A. NO. 02 11799 RGS

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JOSE IBARRA HERRERA,<br>Plaintiff, | ) |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT MOLINO, DONALD MILLER,<br>CHARLES PERRY, PAUL BARATTA,<br>LYNDA NELSON, ANNE P. GLAVIN,<br>JOHN R. CURRY, AND<br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT

### FIRST DEFENSE

The Defendants hereby state that the Plaintiff's Complaint fails to state a cause of action upon which relief can be granted.

### SECOND DEFENSE

The Defendants respond to the allegations of the Plaintiff's Complaint and Jury Demand as follows:

**INTRODUCTION**

1.    The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

**JURISDICTION**

2.    The allegations contained in this paragraph of plaintiff's complaint state a conclusion of law to which the defendants need not respond.

**PARTIES**

1

3.      The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

4.      The Defendants deny the allegations contained in this paragraph.

5.      The Defendants deny the allegations contained in this paragraph.

6.      The Defendants admit the allegations contained in this paragraph.

7.      The Defendants admit that defendant John R. Curry was at all times relevant the Executive Vice President of the Massachusetts Institute of Technology and deny the remaining allegations contained in this paragraph.

8.      The Defendants admit the allegations contained in this paragraph.

**FACTS**

8 (SIC) The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

9.      The Defendants admit defendant Lynda Nelson informed campus police and deny the remaining allegations contained in this paragraph.

10.     The Defendants deny the allegations contained in this paragraph.

11.     The Defendants deny the allegations contained in this paragraph.

12.     The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

13.     The Defendants admit that the named officers were at the time on duty and in uniform and deny the remaining allegations contained in this paragraph.

14.     The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

15.     The Defendants deny the allegations contained in this paragraph.

16.     The Defendants deny the allegations contained in this paragraph.

17.    The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

18.    The Defendants deny the allegations contained in this paragraph.

19.    The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

20.    The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

21.    The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.

22.    The Defendants deny the allegations contained in this paragraph.

23.    The Defendants deny the allegations contained in this paragraph.

24.    The Defendants deny the allegations contained in this paragraph.

25.    The Defendants deny the allegations contained in this paragraph.

26.    The Defendants deny the allegations contained in this paragraph.

27.    The Defendants deny the allegations contained in this paragraph.

28.    The Defendants deny the allegations contained in this paragraph.

29.    The Defendants deny the allegations contained in this paragraph.

**COUNT ONE:  42 U.S.C. § 1983**

30.    The Defendants repeat and reallege their responses to Paragraphs 1 through 29.

31.    The Defendants deny the allegations contained in this paragraph.

31(SIC)The Defendants deny the allegations contained in this paragraph.

32.    The Defendants deny the allegations contained in this paragraph.

33.    The Defendants deny the allegations contained in this paragraph.

3

**COUNT TWO: M.G.L. CH. 12, § 11I**

34.     The Defendants repeat and reallege their responses to Paragraphs 1 through 33.

35.     The Defendants deny the allegations contained in this paragraph.

36.     The Defendants deny the allegations contained in this paragraph.

37.     The Defendants deny the allegations contained in this paragraph.

**COUNT THREE: ASSAULT AND BATTERY**

38.     The Defendants repeat and reallege their responses to Paragraphs 1 through 37.

39.     The Defendants deny the allegations contained in this paragraph.

40.     The Defendants deny the allegations contained in this paragraph.

41.     The Defendants deny the allegations contained in this paragraph.

42.     The Defendants deny the allegations contained in this paragraph.

**COUNT FOUR: FALSE IMPRISONMENT**

43.     The Defendants repeat and reallege their responses to Paragraphs 1 through 44.

44.     The Defendants deny the allegations contained in this paragraph.

45.     The Defendants deny the allegations contained in this paragraph.

46.     The Defendants deny the allegations contained in this paragraph.

47.     The Defendants deny the allegations contained in this paragraph.

**COUNT FIVE: MALICIOUS PROSECUTION**

48.     The Defendants repeat and reallege their responses to Paragraphs 1 through 47.

49.     The Defendants deny the allegations contained in this paragraph.

4

50.    The Defendants deny the allegations contained in this paragraph.

51.    The Defendants deny the allegations contained in this paragraph.

52.    The Defendants deny the allegations contained in this paragraph.

WHEREFORE, the defendants deny that the plaintiff is entitled to judgment in any amount against the defendants and, furthermore, the defense asks this Honorable Court to enter judgment for the defendants and against the plaintiff along with interests, costs and attorneys fees.

## AFFIRMATIVE DEFENSES

### THIRD DEFENSE

The plaintiff's claims are barred or limited by contributory negligence.

### FOURTH DEFENSE

The plaintiff's claims are barred or limited by comparative negligence.

### FIFTH DEFENSE

The plaintiff failed to give adequate notice of his/her claim as required by the Massachusetts Tort Claims Act.

### SIXTH DEFENSE

The plaintiff failed to give timely notice of his claim as required by the Massachusetts Tort Claims Act.

### SEVENTH DEFENSE

The plaintiff's claims are barred or limited by the provisions of the Massachusetts Tort Claims Act.

### EIGHTH DEFENSE

There was probable cause for the plaintiff's alleged arrest/detainment.

### NINTH DEFENSE

Defendants state that they were justified in their acts or conduct and that therefore the plaintiff cannot recover.

## TENTH DEFENSE

Defendants state that his acts and conduct were performed according to, and protected by, law and/or legal process, and that therefore, the plaintiff cannot recover.

## ELEVENTH DEFENSE

Defendants state that their actions are immune from suit as they were engaging in discretionary functions.

## TWELVE DEFENSE

Defendants state that they were privileged in their conduct and acts and that therefore the plaintiff cannot recover.

## THIRTEENTH DEFENSE

The individual defendants are entitled to qualified immunity.

## JURY DEMAND

The defendants request a Trial By Jury on all counts and causes of action to the fullest extent permitted by law.

The defendants,
By their attorneys,

s/Andrea W McCarthy

Leonard Kesten, BBO# 542042
Andrea W. McCarthy, BBO# 562206
BRODY, HARDOON, PERKINS & KESTEN
One Exeter Plaza
Boston, MA  02116
(617) 880-7100

Dated:  10/31/02

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on   10/31/02

s/Andrea W McCarthy

6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 02-11291-RGS

KELLY SAINT FORT

v.

JOHN ASHCROFT, ET AL.

MEMORANDUM AND ORDER ON RESPONDENTS'
MOTION FOR RECONSIDERATION

October 29, 2002

STEARNS, D.J.

I am persuaded by the Respondents' jurisdictional argument (raised for the first time in the instant motion) that the district court lacks subject matter jurisdiction to hear a private claim asserting the protections of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as the treaty, although ratified by the United States, is not self-executing. See Igartua De La Rosa v. United States, 32 F.3d 8, 10 n.1 (1st Cir. 1994). As I understand Petitioner's response, he does not dispute the substance of the Respondents' jurisdictional argument, but maintains his objection to the same procedural shortcoming in the Board of Immigration Appeals' (BIA) handling of his case (the failure of the BIA to specify the factual grounds on which it rejected the Immigration Judge's finding that the Petitioner would more likely than not face torture if he were to be returned to Haiti) that caused this court in the first instance to order a remand to the BIA for clarification. The court did not, as Petitioner now maintains, adopt his argument that the BIA had retroactively and unconstitutionally applied its decision in In Re J-E-, 23 I. & N. Dec. 291 (BIA 2002) to his case. The court specifically held in its



September, 30, 2002 Memorandum of Decision that Saint Fort's case did not implicate the doctrine of retroactivity. An alleged procedural defect of the kind asserted by Saint Fort does not raise a constitutional claim or a "pure issue of law" sufficient to surmount the jurisdictional bar interposed by the Foreign Affairs Reform and Restructuring Act of 1998, § 2242(d). Compare Goncalves v. Reno, 144 F3d 110, 133 (1st Cir. 1998). Relief, if any is to be had, is in the Court of Appeals in conjunction with a review of a final order of removal. 8 U.S.C. §§ 1252(a), (b) (9). Consequently, the motion to reconsider is ALLOWED and the Petition is ordered DISMISSED. The bar against removal of the Petitioner will be extended by ten (10) days to permit the Petitioner to seek relief, if any is available, in the Court of Appeals.

SO ORDERED.

UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 01-CV-10927-RGS

CONSERVATION LAW FOUNDATION, et al.

v.

UNITED STATES DEPARTMENT OF COMMERCE,
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION,
NATIONAL MARINE FISHERIES SERVICES,
and INTERVENOR FISHERIES SURVIVAL FUND[1]

MEMORANDUM AND ORDER ON CROSS-
MOTIONS FOR SUMMARY JUDGMENT

October 31, 2002

STEARNS, D.J.



On May 31, 2001, Oceana, Inc. (f/k/a the Conservation Law Foundation), brought

this Complaint objecting to the May 2001 adoption by the National Marine Fisheries Service

(NMFS) of Framework Adjustment 14 (Framework 14) to the Atlantic Sea Scallop Fishery

Management Plan (Scallop Plan).[2]  Framework 14 regulates scalloping in Atlantic coastal

waters during the 2001 and 2002 fishing seasons.[3]  While the dispute is framed largely

---

[1]On September 10, 2001, the court allowed the motion by the Fisheries Survival Fund to intervene as a defendant.

[2]The Magnuson-Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801-1883, as subsequently amended by Congress in 1990 and 1996, delegates to the NMFS, by and through the Secretary of Commerce, the authority to manage and conserve U.S. coastal fisheries.  The authority of the Secretary is shared with eight Regional Fishery Management Councils who are responsible for the development of Fishery Management Plans like the Scallop Plan.  A fuller description of the workings of the Act can be found in A.M.L. International v. Daley, 107 F. Supp. 2d 90, 93 (D. Mass. 2000).

[3]Scallops are bottom-dwelling mollusks that are typically fished by dredging, a technique that is often destructive to the seabed.  Hence, the scalloping industry has been a focus

around an alleged procedural lapse by the NMFS, plaintiffs' ultimate goal is an injunctive order barring scallopers from the Great South Channel[4] "in order to protect the groundfish habitat and minimize groundfish bycatch." In promulgating Framework 14, the Secretary of Commerce (Secretary) declined to expand the scope of his prior closure orders.[5]

Despite the many pages of briefing this case has generated, plaintiffs' procedural argument rests on the claim that Framework 14 was unlawfully implemented because the Secretary failed to provide the minimum15 days for public comment required by section 304(b)(1)(A) of the Magnuson-Stevens Act, 16 U.S.C. § 1854(b)(1)(A). This section provides that:

> (1) Upon transmittal by the Council to the Secretary of proposed regulations prepared under section 1853(c) of this title, the Secretary shall immediately initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter and other applicable law. Within 15 days of initiating such evaluation the Secretary shall make a determination and –

of intense scrutiny by conservation groups.

[4]In their Complaint, plaintiffs argued that NMFS should have adopted Option 1 to the Scallop Plan calling for the closure of the Southeast part of Georges Bank, the Great South Channel, the New York Bright, and Delmarva. These four areas have gravel or sandy bottoms particularly susceptible to damage from dredging. At oral argument, plaintiffs scaled back the request for injunctive relief, seeking only the closing of the Great South Channel. The Channel separates the western part of Georges Bank from the Nantucket Shoals.

[5]On September 12, 2002, the court asked the parties to brief the issue of whether the reopening of the amendment process by the Secretary had effectively mooted their dispute over Framework 14. After reviewing the responsive submissions, I am satisfied that plaintiffs' challenge to Framework 14 remains justiciable. Framework 14 will expire on February 28, 2003. Plaintiffs reasonably request an expedited decision on the pending cross-motions for summary judgment in light of Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 89-90 (1st Cir. 2002).

(A) if that determination is affirmative, the Secretary shall publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes, for a public comment period of 15 to 60 days; . . .

Section 1853(c) requires that a Council submit for the Secretary's review any proposed regulation that it "deems necessary or appropriate" for "(1) implementing a fishery management plan or plan amendment . . . [or] . . . (2) making modifications to regulations implementing a fishery management plan or plan amendment . . . after the plan or amendment is approved under section 1854 of this title." A regulation is to be distinguished from a framework adjustment. A framework adjustment is an administrative procedure permitting "quick, efficient changes to [Fishery Management Plans] as the need arises."[6] Defendants' Consolidated Memorandum, at 9-10. See Southern Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1419 (M.D. Fla. 1998). A framework adjustment is typically implemented without the observance of the formalities of notice and public comment mandated by section 1854(b)(1)(A). Framework 14 was so implemented after a finding by the New England Regional Fishery Management Council that its publication as a proposed regulation was neither "necessary [n]or appropriate." See 50 C.F.R. § 648.55(g)(1)&(2). Consequently, Framework 14 was published as a final rule by the Secretary's "action."

NMFS, relying on the literal wording of the statute, maintains that section 1854(b)(1)(A) mandates public comment only when a Regional Fishery Management Council submits a "proposed regulation" pursuant to section 1853(c), and not when a framework adjustment to a Fishery Management Plan is implemented by an "action taken

---

[6]The regulation setting out the abbreviated procedure for adopting a framework adjustment to the Scallop Plan is codified at 50 C.F.R. § 648.55.

3

by the Secretary," as was the case with Framework 14.  Whether the Secretary, despite

custom and practice, is required by section 1854(b)(1)(A) to publish any interim change to

a Fishery Management Plan as a "proposed regulation" is at the core of the parties' dispute.

Plaintiffs' argument on this score rests on the holding of National Resources Defense

Council v. Evans, 168 F. Supp. 2d 1149 (N.D. Cal. 2001) (NRDC), which in turn relied on

Tutein v. Daley, 43 F. Supp. 2d 113, 121 (D. Mass. 1999), for the proposition that there is

no statutorily meaningful distinction between a proposed regulation and an action taken by

the Secretary, at least insofar as the notice and public comment requirements of section

1854(b)(1)(A) are concerned.[7]  In reaching this conclusion, the NRDC court adopted

Tutein's definition of a regulation as "a legally binding obligation having the force of law,"

and then reasoned that because an action taken by the Secretary is legally binding,

Congress must have meant the terms to serve as functional equivalents, at least for

purposes of section 1854(b)(1)(A).

---

[7]Plaintiffs also rely on the legislative history of § 1853(c) as support for the proposition that the public comment period was intended to apply to framework adjustments.  As stated in the Senate Report:

> [i]n recent years, Councils have increased their use of framework fisheries management plans that rely on regulations to establish fishery parameters like season opening and closures, catches, and allocations of harvest among sectors of a fishery . . . . [T]his subsection, along with changes made in section 110 of the reported bill [later codified at 16 U.S.C. § 1854] would establish streamlined procedures for consideration and approval of all regulations submitted by a Council to the Secretary.

S. Rep. No. 104-276 at 18-19 (1996), reprinted in U.S.C.C.A.N. 4091.  Legislative history is not a preferred tool of construction when, as is the case here, the meaning of the words of a statute are plain, while those of its authors are not.  Cf. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992).

framework adjustment to a Fishery Management Plan is implemented by an "action taken by the Secretary," as was the case with Framework 14. Whether the Secretary, despite custom and practice, is required by section 1854(b)(1)(A) to publish any interim change to a Fishery Management Plan as a "proposed regulation" is at the core of the parties' dispute. Plaintiffs' argument on this score rests on the holding of Natural Resources Defense Council v. Evans, 168 F. Supp. 2d 1149 (N.D. Cal. 2001) (NRDC), which in turn relied on Tutein v. Daley, 43 F. Supp. 2d 113, 121 (D. Mass. 1999), for the proposition that there is no statutorily meaningful distinction between a proposed regulation and an action taken by the Secretary, at least insofar as the notice and public comment requirements of section 1854(b)(1)(A) are concerned.[7]  In reaching this conclusion, the NRDC court adopted Tutein's definition of a regulation as "a legally binding obligation having the force of law," and then reasoned that because an action taken by the Secretary is legally binding,

---

[7]Plaintiffs also rely on the legislative history of § 1853(c) as support for the proposition that the public comment period was intended to apply to framework adjustments. As stated in the Senate Report:

> [i]n recent years, Councils have increased their use of framework fisheries management plans that rely on regulations to establish fishery parameters like season opening and closures, catches, and allocations of harvest among sectors of a fishery . . . . [T]his subsection, along with changes made in section 110 of the reported bill [later codified at 16 U.S.C. § 1854] would establish streamlined procedures for consideration and approval of all regulations submitted by a Council to the Secretary.

S. Rep. No. 104-276 at 18-19 (1996), reprinted in U.S.C.C.A.N. 4091. Legislative history is not a preferred tool of construction when, as is the case here, the meaning of the words of a statute are plain, while those of its authors are not. Cf. Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992).

4

The nod to Tutein, however, is somewhat misdirected.  The issue in Tutein was whether a non-binding advisory guideline issued under section 1851(b) of the Magnuson-Stevens Act constituted a "regulation" subject to judicial review under section 1855(f). The Magistrate Judge in Tutein, noting that the Act specifically states that an advisory guideline "shall not have the force and effect of law," quite sensibly concluded that an advisory guideline was not a regulation and therefore not subject to judicial review.  It does not follow from this premise, however, that because Congress made all legally binding actions the subject of judicial review, the word "regulation" as used in the Act also means "action."[8]

Section 1855(f) clearly recognizes that "actions taken by the Secretary" and "regulations promulgated by the Secretary," are distinct regulatory events, thus evincing Congress's understanding of and acquiescence in the difference.[9]   Plaintiffs counter that the distinction, while real, is besides the point as section 1855(f) is concerned with judicial review and not with notice and comment.  Plaintiffs point out that the NRDC court rejected any argument based on the section 1855(f) distinction as taking "Congress' express language extending public and judicial oversight of agency action out of its context and turn[ing] it against its very purpose."  NRDC, 168 F. Supp. 2d at 1155.  The point presumably is that because section 1855(f), as amended, expanded the scope of judicial

---

[8]The syllogism is based on an apparent logical fallacy, i.e., all priests are men, George Washington was a man, therefore George Washington was a priest.  Simply because two things share a defining characteristic, it does not follow that they are necessarily identical.

[9]The distinction found its way into the Act as a result of a 1990 amendment expanding the scope of judicial review to include challenges to framework actions taken by the Secretary and not simply challenges to regulations (as was the case prior to the amendment).  The public comment requirements of section 1854(b)(1)(A) were inserted by a 1996 amendment to the Act.

review, it reflects an overriding purpose of Congress to involve the public intensively in the implementation of the Act. Consequently, using section 1855(f) as a blunt instrument to insulate actions taken by the Secretary from public comment does violence to that very purpose. While this may seem plausible, it presumes that Congress indeed had such an overriding purpose. It would seem just as plausible that Congress may have thought public comment a more useful check on a regulation proposed by a politically unaccountable Council than on an action taken by a politically answerable Secretary. Congress may also well have believed that there was some value in expediting the implementation of adjustments to a Fishery Management Plan whose implementing regulations were already in place, particularly in light of the vagaries inherent in managing a complex and volatile ecosystem. Nonetheless, whatever Congress may have had in mind, the fact remains that section 1855(f) draws a clear distinction between "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary [implementing] a fishery management plan." Under the rules of statutory construction, when Congress uses the same word in separate sections of a statute to describe the same subject matter, the word is presumed to have been used with the same meaning in each section. Thus, a regulation for purposes of section 1854 is a regulation for purposes of section 1855(f), and not both an action and a regulation for purposes of one section but not for purposes of the other. If Congress had intended section 1854(b)(1)(A) to apply to actions as well as to proposed regulations, it would have had no difficulty in saying so. It did not, and therefore the 15 day

6

public comment period of section 1854(b)(1)(A) was not triggered by the Secretary's action in implementing Framework 14.[10]

Plaintiffs' substantive argument is that Framework 14 is flawed because the NMFS's refusal to order the closing of additional areas to fishing fails to "minimize to the extent practicable adverse effects on . . . habitat," as required by section 303(a)(7) of the Magnuson-Stevens Act, 16 U.S.C. § 1853(a)(7), and fails to minimize bycatch as required by National Standard 9, 16 U.S.C. § 1851(a)(9).[11]  The key word, of course, is "practicable." The record amply demonstrates that habitat and bycatch were considered in formulating Framework 14.  As defendants point out, Framework 14 continues the prohibition on scallop fishing in Georges Bank Closed Areas I and II and the Nantucket Lightship Closed Area, an area of some 5000 square nautical miles.  Framework 14 also maintains restrictions on days at sea, catch and mesh sizes, and seasonal access to sensitive areas.  Plaintiffs' criticism of Framework 14 is ultimately one of degree, and not kind.  That is to say, plaintiffs fault the NMFS for failing to give habitat protection and the reduction of bycatch the full emphasis that plaintiffs believe they deserve, not that the NMFS failed to respond to the statutory directives to the extent that it deemed practicable under the circumstances in which Framework 14 was adopted.

---

[10]Having found no violation of the public notice and comment provisions of section 1854(b)(1)(A), I also conclude that the adoption of Framework 14 did not violate the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 553(a)-(c). I agree with defendants that the NMFS's compliance with the abbreviated rulemaking procedure set out in 50 C.F.R. § 648 constituted "good cause" within the meaning of 5 U.S.C. § 553(b)(B), for dispensing with a further period for public notice and comment.

[11]Defendants also argue, accurately I believe, that § 1853(a)(7) applies only to the formulation of a Fishery Management Plan and not to framework adjustments to a plan already in place.

7

While the court, if it were writing on a blank slate, might adopt at least some of the alternative measures that plaintiffs recommend, it is constrained by law from substituting its judgment for that of the NMFS. See Association of Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) ("[P]olicy choices are for the agency, not the court to make"). Because the court cannot say that the adoption of Framework 14 lies outside "the bounds of reasoned decision making," it cannot characterize the Secretary's action as arbitrary or capricious. M/V Cape Ann v. United States, 199 F.3d 61, 63-64 (1st Cir. 1999). Moreover, contrary to plaintiffs' assertions, there is no persuasive evidence in the record suggesting that the NMFS failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d, either with regard to the integration of the Supplemental Environmental Impact Statement into the decision making process or in its consideration of plaintiffs' suggested alternatives.

ORDER

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED. Defendants' cross-motion for summary judgment is ALLOWED.

SO ORDERED.

Richard J. Stearns

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-CV-12067-RGS

DICKSON, S.A.

v.

THOMAS A. BARRETT, et al.

MEMORANDUM AND ORDER ON
MOTION FOR A PRELIMINARY INJUNCTION

November 4, 2002

STEARNS, D.J.

As stated at the conclusion of the hearing, the Motion for a Preliminary Injunction is DENIED, the court not being persuaded that there is any assurance that plaintiff will prevail on the merits. See generally, Shields v. Zuccarini, 254 F.3d 476, 484-485 (3d Cir. 2001). The court, however, accepts defendants' representation that they have no intention of relinquishing the ownership of the domain name DICKSON.US during the duration of the litigation nor any intention of making any unlawful use of the domain name. The court further accepts defendants' stipulation that neither they nor any entity with which they are affiliated or over which they exercise control will transfer, relinquish, encumber or alienate the domain name DICKSON.US without the prior approval of the court.

On an unrelated matter that arose during the hearing, defendants are required to obtain legal representation for their defendant corporation Name Share, Inc. Under the law of Massachusetts, "except for small claim matters, a corporation may not be represented in judicial proceedings by a corporate officer who is not an attorney licensed to practice law in the Commonwealth." Varney Enterprises, Inc. v. WMF, Inc., 402 Mass. 79, 79 (1988). See

also L.R. 83.5.2(d).  Defendants will cause an appearance to be entered on behalf of the

corporation within twenty-one (21) days of the entry of this Order.  The parties will submit a

final proposed scheduling order within fourteen (14) days of the filing of that appearance.

SO ORDERED.

UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SYDNEY A. ROSE,<br>Plaintiff<br><br>vs.<br>ROBERT LASKEY, AS COMMISSIONER OF<br>DEPARTMENT OF REVENUE,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action #01-11985-RGS**

## DEFENDANT ROBERT LASKEY IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF DEPARTMENT OF REVENUE ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

1.    The defendant Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue states that it does not have sufficient knowledge or information to admit or deny the allegations in paragraph one of the complaint.

2.    The defendant admits that Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue states that this is the location of his office.

3.    The defendant Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue states that count three of the plaintiff complaint does not contain any substantive factual allegations and appears to call for a legal conclusion therefore no response is required. Defendant further notes that plaintiff has not complied with all conditions precedent to filing suit before this court under Title I of the ADA.

4.    The defendant Robert Laskey in his Official Capacity as Commissioner of the

Department of Revenue denies the allegations in paragraph four of the plaintiff's complaint.

5.      The defendant Robert Laskey in his Official Capacity as commissioner of the Department of Revenue states that it does not have sufficient knowledge or information to admit or deny the allegations in paragraph five of the complaint.

6.      The defendant Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue states that it denies the allegations in paragraph six of the plaintiff's complaint.

## RELIEF SOUGHT

The defendant Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue opposes the relief sough by the plaintiff.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claim for Equitable relief against Robert Laskey in his Official Capacity as Commissioner of the Department of Revenue is barred under the ADA be cause he failed to comply with all the conditions precedent under Title I of the ADA including but not limited to obtain a right to sue letter.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claim against Commissioner Laskey in his Official Capacity under the ADA is barred because he is not disabled as that term is defined in the statute.

Respectfully submitted
ROBERT LASKEY IN HIS OFFICIAL
CAPACITY AS COMMISSIONER OF THE

DEPARTMENT OF REVENUE
THOMAS F. REILLY
ATTORNEY GENERAL

Marini Torres-Benson BBO# 632354
Assistant Attorney General
Government Bureau/Trial Division
200 Portland Street, 3rd Floor
Boston, MA 02114
(617) 727-2200 x 3331

## CERTIFICATE OF SERVICE

I, Marini Torres-Benson, Assistant Attorney General, hereby certify that I have this day, November 4, 2002, I served the foregoing documents upon the attorney for the plaintiff, by mailing a copy, certified mail to: Sydney A. Rose, 15 Lamprey Road, Kensington, NH 03803-6709.

Marini Torres-Benson
Assistant Attorney General

## CERTIFICATE OF SERVICE

  I, Marini Torres-Benson, Assistant Attorney General, hereby certify that I have this day, March 4, 2002, served the foregoing documents upon the attorney for the plaintiff, by mailing a copy, certified mail to:

      Sydney A. Rose
      93 Witchtrot Rd.
      Sanbornville, N.H. 03872-4201


      Marini Torres-Benson
      Assistant Attorney General

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 02-10159-RGS

THERESA CAMACHO

v.

UNITED STATES OF AMERICA

MEMORANDUM AND ORDER ON DEFENDANT'S
MOTION TO DISMISS

November 4, 2002

STEARNS, D.J.

Theresa Camacho was injured when she fell while attempting to climb down from a doctor's examining table. In due course, she brought a Complaint alleging medical malpractice on the part of the examining physician, Dr. Michelle Hallee, who had left her on the table unattended. What began as an action in the Superior Court became a federal case when the parties realized that Dr. Hallee was a federal employee. The United States now moves to dismiss on grounds that Camacho failed to make a timely presentment under the Federal Tort Claims Act (FTCA).

BACKGROUND

The facts alleged by the plaintiff, which for present purposes must be taken as true, are these. On August 6, 1997, Camacho, then an apparently frail 78 year old woman, was seen by Dr. Michelle Hallee at the Winthrop Community Health Center (WCHC) after she complained of a swelling in her left jaw. At the conclusion of the examination, Camacho was left sitting on an examination table while Dr. Hallee dictated her treatment notes. When Camacho attempted to dismount from the table, she fell, fracturing her left hip and

pelvis. She was then sent home without any evaluation of her injuries. On August 16, 1997, Camacho was admitted to Massachusetts General Hospital for treatment.

Camacho, through her attorney, James Riley, a partner in the firm of Karol & Riley, brought an action for medical malpractice against Dr. Hallee in the Superior Court on March 27, 1998. On April 10, 2000, a judge of that court allowed Camacho's motion for a speedy trial on account of her advanced age and deteriorating health. On April 21, 2000, Dr. Hallee formally notified the state court that she "ha[d] just learned (through her counsel) that because of her employment relationship with East Boston Neighborhood Health Center she was a federal employee for purposes of the Federal Tort Claims Act for the time period and medical care at issue."[1] On June 14, 2000, the United States removed the case to federal court and moved to substitute itself as the proper defendant. On July 20, 2000, Judge Tauro allowed the motion.

On August 24, 2000, Assistant United States Attorney (AUSA) Carmody informed attorney Riley that the United States intended to seek a dismissal because Camacho had failed to file an administrative claim within two years of the accident as required by the FTCA, 28 U.S.C. § 2675. Carmody requested a consent to a voluntary dismissal. On September 8, 2000, Riley sent Carmody a conditional consent with a proposed stipulation that Camacho would have six months to file her administrative claim with the Department

---

[1]Because WCHC receives federal funding under the Federally Supported Health Centers Assistance Act of 1992, 42 U.S.C. § 233(a), any action for employee negligence must be brought under the FTCA.

of Health and Human Services.[2]  The proposed consent stated that

> [p]laintiff agrees to voluntary dismissal of her case without prejudice with the
> understanding that this course of action will not prejudice her rights.  Namely,
> she has six months after the dismissal of this action to file the administrative
> claim with the Department of Health and Human Services (DHH) in
> accordance with the FTCA 28 U.S.C. § 2679(d)(5).  Assuming that the DHH
> will not settle her claim, the statute of limitations should she re-file this case
> in federal court will run from the date of her original filing in state court in
> accordance with federal case law.  See, e.g., Staple v. U.S., 740 F.2d 766
> (1984); McGowan v. Williams, 623 F.2d 1239 (1980); Whistler v. U.S., 252
> F. Supp. 913 (1966).

In a letter accompanying the draft, Riley stated as follows.

> This letter is to inform you that we are willing to voluntarily dismiss this case
> from federal court.  We are now aware that during the relevant time period
> Michelle Hallee, M.D. was a federal employee which brings this claim within
> the Federal Tort Claims Act (FTCA).  Additionally, we are aware of the
> administrative notice requirement of the FTCA and have already completed
> Standard Form 95 on behalf of Mrs. Camacho, a preliminary copy of which
> I have enclosed simply for your perusal.  We will be submitting said form to
> the Department of Health and Human Services immediately upon
> confirmation of dismissal from federal court.  It is our understanding that
> these actions will in no way harm Mrs. Camacho's rights.

Carmody rejected Riley's proposed draft, suggesting instead that the parties file the

"bare bones" stipulation of dismissal without prejudice that she "routinely used and

recommended."  On October 25, 2000, Camacho filed the stipulation of dismissal in the

form Carmody proposed.   The stipulation made no reference to the filing of an

administrative claim.   Three days later Marshall Karol, Riley's law partner, died of

metastatic melanoma.[3]

---

[2]On September 12, 2000, Camacho entered into an agreement to "employ the
attorney [James Riley] to represent her in pursuing a civil negligence claim for personal
injury under the Federal Tort Claims Act against Michelle Hallee, M.D."

[3]Karol was diagnosed with cancer in March of 2000.  Karol was "an advisor and
mentor to everyone in the [firm]."  His death "was devastating and disruptive to the entire

3

On February 14, 2001, Camacho filed an FTCA administrative claim with the Department of Health and Human Services. Camacho refiled her action against the United States on January 29, 2002. The United States responded with the instant motion to dismiss, pointing out that Camacho's untimely filing of her administrative claim failed to satisfy the jurisdictional requirements of the FTCA.

## DISCUSSION

The FTCA requires, as a condition precedent to the bringing of a negligence suit against the United States, that a plaintiff file an administrative claim with the appropriate government agency and that the claim be formally denied by the agency in writing. 28 U.S.C. § 2675. The FTCA contains a savings clause to protect plaintiffs caught unawares by the insertion of the United States as a party.

> Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if –
>
> (A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and
>
> (B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

28 U.S.C. § 2679(d)(5).

There is no dispute but that Camacho's administrative claim was filed well after the 60 day grace period had expired, apparently because of a mistaken belief on the part of

_____

office . . . . [T]he entire office was moved from Boston to Walpole and Attorney Karol's clients were notified of his passing, his [heavy] caseload was absorbed . . . , and an enormous emotional and physical toll was borne by all." There is no reason to doubt these tragic circumstances, but Karol was neither an attorney of record nor involved in the litigation of this case.

4

Camacho's attorneys that the FTCA grace period was six months rather than 60 days. Camacho entreats the court to excuse the procedural default by applying either the doctrine of equitable estoppel or the doctrine of equitable tolling. Despite the "strong policy favoring the disposition of cases on the merits," Zavala Santiago v. Gonzalez Rivera, 553 F.2d 710, 712 (1st Cir. 1977), the court can do neither.

"Courts invoke equitable estoppel when a defendant's conduct causes a plaintiff to delay bringing an action or pursuing a claim he or she was entitled to initiate by law." Kelley v. N.L.R.B., 79 F.3d 1238, 1247 (1st Cir. 1996). To satisfy the elements of a claim of equitable estoppel "(1) [t]he party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel had a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." Clauson v. Smith, 823 F.2d 660, 661 (1st Cir. 1987). See also Heckler v. Community Health Services., 467 U.S. 51, 59 (1984). Equitable estoppel in its common-law incarnation did not apply against the federal government. Office of Personnel Management v. Richmond, 496 U.S. 414, 419 (1990). "The general rule is that 'those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.'" Kelley, 79 F.3d at 1249. A party seeking to invoke the doctrine must at a minimum "have reasonably relied on some 'affirmative misconduct' attributable to the sovereign." United States v. Ven-Fuel, Inc., 758 F.2d 741, 761 (1st Cir. 1985). See also In re Ludlow Hospital Society, Inc., 124 F.3d 22, 25-26 (1st Cir. 1997). Absent evidence of affirmative misconduct, there is no basis for asserting an estoppel claim. Frillz, Inc. v. Lader, 104 F.3d 515, 518 (1st Cir. 1997). See also Heckler, 467 U.S. at 67 (1984) (Rehnquist, J.,

5

concurring) (noting that the Supreme Court has never upheld an estoppel claim against the government).

Here, there is no evidence of any misconduct whatsoever by the government. AUSA Carmody never affirmatively misrepresented the time limits for the filing of an administrative claim. Even if she had, Camacho was represented by counsel who would have been expected to know the law. See Ramos-Baez v. Bossolo-Lopez, 240 F.3d 92, 94 (1st Cir. 2001) ("All counsel, therefore, have the undelegable responsibility to know and follow [the applicable] rules."); Sarit v. U.S. Drug Enforcement Admin., 987 F.2d 10, 15 (1st Cir. 1993) ("Counsel is charged with knowledge of the law, and that knowledge is imputed to plaintiffs."). Moreover, counsel in this case knew the applicable law. Attorney Riley's cover letter to AUSA Carmody cited the relevant section of the FTCA and enclosed a completed copy of the proper administrative claim form. Under the circumstances, AUSA Carmody would have had no reason to believe that counsel was laboring under the mistaken impression that he had six months to file the form (and even if she did, she had no duty, other than one of common courtesy, to correct that impression). Because no fault can be attributed to AUSA Carmody, there is no basis on which to invoke an estoppel.

The doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff exercising reasonable diligence could not for reasons beyond her control have discovered information essential to the filing of a suit. Gonzalez v. United States, 284 F.3d 281, 291 (1st Cir. 2002). Unlike the case with equitable estoppel, there is no common-law bar to the invocation of equitable tolling against the government. Nonetheless, "the principles [of the doctrine] do not extend to what is at best a garden variety claim of excusable neglect." Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96 (1990). The

6

First Circuit Court of Appeals has

> identified five factors that should guide courts in evaluating a claimant's entitlement to such tolling: (1) a lack of actual notice of a time limit; (2) a lack of constructive notice of a time limit; (3) diligence in the pursuit of one's rights; (4) an absence of prejudice to a party opponent; and (5) the claimant's reasonableness in remaining ignorant of the time limit. See Benitez-Pons v. Commonwealth of Puerto Rico, 136 F.3d 54, 61 (1st Cir.1998) (deciding whether to toll the running of a statute of limitations) (citing Kale v. Combined Ins. Co., 861 F.2d 746, 752 (1st Cir.1988)). The fundamental principle is that equitable tolling "is appropriate only when the circumstances that cause a [party] to miss a filing deadline are out of his hands." Salois v. Dime Savings Bank, 128 F.3d 20, 25 (1st Cir.1997) (citation and internal quotation marks omitted). For this reason, "[e]quitable tolling is unavailable where a party fails to exercise due diligence." Benitez-Pons, 136 F.3d at 61.

Jobe v. I.N.S., 238 F.3d 96, 100 (1st Cir. 2001).

Plaintiff learned that Dr. Hallee was a federal employee for purposes of the FTCA no later than April 21, 2000. The motion to substitute the United States as a defendant was allowed on July 20, 2000. The stipulation of dismissal was entered by the plaintiff on October 25, 2000. Pursuant to 28 U.S.C. § 2679(d)(5)(B), plaintiff had 60 days thereafter to file an administrative claim. She did not do so until February 14, 2001. The FTCA statute imposing the 60 day limitations period was repeatedly cited in court papers and in correspondence by both parties. Nothing was hidden or concealed from the plaintiff and nothing was therefore "out of [her] hands."

The only additional argument raised at the motion hearing was plaintiff's assertion that no prejudice would accrue to the United States should the court excuse her failure to comply with the filing deadline.

> Although absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures. Procedural requirements established by Congress for gaining access to the federal

7

courts are not to be disregarded by courts out of a vague sympathy for particular litigants. As we stated in <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826 (1980), "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

<u>Baldwin County Welcome Center v. Brown</u>, 466 U.S. 147, 152 (1984).

The court is not unsympathetic to the fact that because of a misstep by her lawyers plaintiff's case will not be adjudicated on its merits. The court understands that plaintiff's lawyers did not act in bad faith or out of callous neglect of their client. The court has exerted itself to conceive a principled means of extricating this case from the procedural trap into which it has fallen. But unfortunately, no imagining suffices when the law, even if harshly, has drawn a line so impenetrably bright.

ORDER

For the foregoing reasons, the government's Motion to Dismiss for Lack of Subject Matter Jurisdiction is <u>ALLOWED</u>.

SO ORDERED.

UNITED STATES DISTRICT JUDGE

8

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

---

ADVANCED POLYMER TECHNOLOGY
CORPORATION,
        Plaintiff

v.

QUEST SPORTS SURFACING, LLC,
        Defendant

Civil Action
No. 02-11591-RGS

---

## ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, AND JURY CLAIM OF QUEST SPORTS SURFACING, LLC

Defendant, Quest Sports Surfacing, LLC ("Quest"), responds to the numbered paragraphs of the Plaintiff's Complaint to Recover Outstanding Indebtedness ("Complaint"):

### PARTIES, JURISDICTION, AND VENUE

1.      Quest is without information or knowledge sufficient to form a belief as to the truth of the factual allegations contained in paragraph 1 of the Complaint.

2.      Quest admits the allegations contained in paragraph 2 of the Complaint with the exception that its principal place of business is located at 2501 Mount Pleasant Boulevard, Muncie, Indiana.

3.      To the extent that paragraph 3 comprises statements of law and/or legal conclusions, no response is required by Quest. Quest denies any allegation of fact contained within paragraph 3.

4.      To the extent that paragraph 4 comprises statements of law and/or legal conclusions, no response is required by Quest. Quest denies any allegation of fact contained within paragraph 4.

## FACTS COMMON TO ALL COUNTS

5.      Quest admits only that it entered into a single agreement with APT concerning the purchase of Turf for installation at various project sites including some of those identified in paragraph 5. Quest, however, expressly denies that there was more than one BB&N Project.

6.      Quest admits only that under the terms of the parties' single agreement, APT was to provide the Turf and to ship it, according to Quest's respective instructions, to designated locations in Massachusetts where Quest or its designated subcontractor were to install it. Quest denies all other allegations of fact contained within paragraph 6.

7.      Quest admits only that under the terms of the parties' single agreement, Quest was obligated to make partial payment of the Turf purchase price for each respective project in advance of delivery of the Turf to the respective project sites. Quest denies all other allegations of fact contained within paragraph 7.

8.      Quest admits only that under the terms of the parties' single agreement, upon any shipment of Turf, APT was to generate invoices for any balances due concerning the shipment. Quest lacks sufficient information to admit or deny all other allegations contained within paragraph 8, and, therefore, denies same.

9.      Quest denies that the document referenced in paragraph 9 sets forth the terms and conditions of, or constitutes any part of, the parties' agreement.  Quest lacks sufficient information to admit or deny all other allegations contained within paragraph 9, and, therefore, denies same.

10.      Quest denies that the document referenced in paragraph 10 sets forth the terms and conditions of, or constitutes any part of, the parties' agreement.  Quest denies all other allegations of fact contained within paragraph 10.

## COUNT I-BREACH OF CONTRACT-BUCKINGHAM, BROWN & NICHOLS
## PROJECT 1

11.     Quest realleges and reasserts its responses contained within the preceding paragraphs 1-10.

12.     Quest lacks sufficient information to admit or deny that on July 16, 2001, it sent the document attached to the Complaint as Exhibit "B," the terms of which speak for themselves, and, therefore, denies same. Quest expressly denies that there was more than one BB&N Project, as suggested by the quoted designation contained within this paragraph.

13.     Quest admits the allegations contained within paragraph 13.

14.     Quest admits only that it made partial payment prior to the provision of the Turf. Quest denies all other allegations contained within this paragraph.

15.     Quest admits only that APT sent the invoice attached to its Complaint as Exhibit "C," the terms of which speak for themselves.  Quest expressly denies that APT fully performed its obligations to provide and ship the ordered Turf.

16.     Quest denies the allegations contained within paragraph 16.

17.     Quest denies the allegations contained within paragraph 17.

## COUNT II-BREACH OF CONTRACT-BUCKINGHAM, BROWN & NICHOLS
## PROJECT 2

18.     Quest realleges and reasserts its responses contained within the preceding paragraphs 1-17.

19.     Quest expressly denies that the parties' agreement concerned a second project at BB&N; at all times there was only one project to be performed at BB&N.  Quest denies all other allegations contained within paragraph 19.

20.     Quest admits only that it did not send a written purchase order for the replacement Turf necessary for the one and only BB&N Project. Quest denies all other allegations contained within paragraph 20.

21.     Quest admits the allegations contained within paragraph 21.

22.     Quest admits only that it paid APT the full balance owing concerning the Turf for the one and only BB&N Project.  Quest denies all other allegations contained within paragraph 22.

23.     Quest admits only that APT sent the invoice attached to its Complaint as Exhibit "D," the terms of which speak for themselves.  Quest expressly denies that APT fully performed its obligations to provide and ship the ordered Turf.

24.     Quest denies the allegations contained within paragraph 24.

25.     Quest denies the allegations contained within paragraph 25.

### COUNT III-BREACH OF CONTRACT-SOCCER CITY PROJECT

26.     Quest realleges and reasserts its responses contained within the preceding paragraphs 1-25.

27.     Quest lacks sufficient information to admit or deny that on June 21, 2001, it sent the document attached to the Complaint as Exhibit "E," the terms of which speak for themselves, and, therefore, denies same.

28.     Quest admits the allegations contained within paragraph 28.

29.     Quest admits that it made partial payment prior to the provision and shipment of the Turf.  Quest denies all other allegations contained within paragraph 29.

30.     Quest admits only that APT sent the invoice attached to its Complaint as Exhibit "F," the terms of which speak for themselves.  Quest expressly denies that APT fully performed its obligations to provide and ship the ordered Turf.

31.     Quest denies the allegations contained within paragraph 31.

32.     Quest denies the allegations contained within paragraph 32.

### COUNT III-BREACH OF CONTRACT-MANSFIELD PROJECT

33.     Quest realleges and reasserts its responses contained within the preceding paragraphs 1-32.

34.     Quest lacks sufficient information to admit or deny that on June 21, 2001, it sent the document attached to the Complaint as Exhibit "F," the terms of which speak for themselves, and, therefore, denies same.

35.     Quest admits the allegations contained within paragraph 35.

36.     Quest admits only that it made partial payment prior to the provision and shipment of the Turf.  Quest denies all other allegations contained within paragraph 36.

37.     Quest admits only that APT sent the invoice attached to its Complaint as Exhibit "H," the terms of which speak for themselves.  Quest expressly denies that APT fully performed its obligations to provide and ship the ordered Turf.

38.     Quest denies the allegations contained within paragraph 38.

39.     Quest admits the allegations contained within paragraph 39.

40.     Quest admits only that APT sent the invoice attached to its Complaint as Exhibit "I," the terms of which speak for themselves.  Quest expressly denies that APT fully performed its obligations to provide and ship the ordered Turf.

41.     Quest denies the allegations contained within paragraph 41.

42.     Quest denies the allegations contained within paragraph 42.

## AFFIRMATIVE DEFENSES

1.     APT's allegations fail to state claims against Quest upon which relief may be granted and should be dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(6).

2.     APT's claims are barred because of its own prior breaches.

3.     APT's claims are barred because of its failure to meet the necessary conditions precedent to any right of recovery.

4.     APT's claims are barred as it has suffered no damage.

5.     APT's claims are barred as its damages, if any, were caused by its own actions and omissions, or by those actions or omissions of its own agents.

-5-

6.      APT's claims are barred as its damages, if any, were caused by third parties over whom Quest has no control and for whom Quest is not responsible.

7.      APT's's claims are barred as the amount of its damages, if any, is less than the amount of damage it has caused to Quest through its own actions or omissions, or through the actions or omissions of its own agents.

8.      APT's claims are barred as it has caused damage to Quest through its own actions or omissions, or through the actions or omissions of its own agents.

9.      APT may not recover in this action for its failure to join one or more necessary parties.

10.      APT's claims are barred because, through its actions and conduct, APT released any right of recovery it may have had against Quest.

11.      APT's claims are barred by the doctrine of estoppel.

12.      APT's claims are barred by the doctrine of waiver.

13.      APT's claims are barred by the Statute of Frauds.

## COUNTERCLAIM

Quest Sports, LLC ("Quest"), hereby asserts a counterclaim for breach of contract against Advanced Polymer Technology Corporation ("APT"):

## FACTS

1.      In or about the spring of 2001 Quest and APT entered into an agreement whereby APT agreed to provide Poligras NF Premier Synthetic Turf (the "Turf") to Quest, for installation by Quest, at several project sites in Massachusetts.

2.      The agreement covered project sites in Belmont, Middlesex County, Massachusetts ("Belmont Project"); Cambridge, Middlesex County, Massachusetts ("BB&N Project"); Mansfield, Bristol County, Massachusetts ("Mansfield Project"); and Wilbraham, Hampden County, Massachusetts (the "Soccer City Project").

-6-

3.      By the terms of the agreement, APT was to provide Turf for each of these projects in amounts to be requested thereafter by respective purchase orders from Quest.

4.      Also by the terms of the agreement, APT was to provide the Turf at a price of $1.30 per square-foot for the Belmont project, and at a price of $1.40 per square-foot for each of the other projects.

5.      On or about July 16, 2001, Quest sent a written purchase order to APT for 15,750 square-feet of Turf for installation at the BB&N Project.

6.      Pursuant to the parties' agreement, the purchase price was to be $1.40 per square-foot.

7.      Unfortunately, due to manufacturing difficulties, APT failed to timely deliver the Turf for the BB&N Project.

8.      As such, in order to meet its installation deadlines for the BB&N Project, Quest was forced to utilize a portion of the Turf which had been previously delivered for the Belmont Project.

9.      Upon inspection of the Turf installation, the architect for the BB&N Project rejected it due to manufacturing defects in the Turf, namely, inconsistencies in its coloring.

10.     As a result, Quest was forced to remove the defective Turf, and to perform an entirely new installation at the BB&N Project.

## COUNT I
### (Breach of Contract)

11.     Quest expressly realleges paragraphs 1 through 10 of its Counterclaim as if fully set forth herein.

12.     APT's failure to timely deliver ordered Turf, and its provision of defective Turf, constitute material breaches of the parties' agreement.

13.     APT's breaches have caused Quest to suffer damage in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, the Defendant, Quest Sports, LLC, requests that this Court grant the following relief:

1.    Enter judgment in favor of Quest Sports, LLC on all Counts of the Complaint, dismissing those claims against it, and awarding its costs of defense;

2.    Enter judgment in favor of Quest Sports, LLC and against Advanced Polymer Technologies Corporation on Count I of the Counterclaim, finding that Advanced Polymer Technologies Corporation has breached the parties' agreement, and that Quest Sports, LLC has been damaged in an amount to be assessed at trial; and

3.    For such other and further relief as this Court deems just and proper.

**Quest Sports, LLC claims trial by jury on all issues so triable as to both the Complaint and the Counterclaim.**

Respectfully submitted,

QUEST SPORTS SURFACING, LLC

By its Attorneys,
RIEMER & BRAUNSTEIN LLP

Dated: November 1, 2002

Brian P. McDonough
BBO NO. 637999
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

and

P. Gregory Cross
P. Gregory Cross, P.C.
Indiana Bar No. 3448-18
Post Office Box 3229
Muncie, Indiana 47307-3229

741473.1

-8-

## CERTIFICATE OF SERVICE

I, Brian P. McDonough, hereby certify that on this _1st_ day of November, 2002, I served the foregoing, by causing a copy of same to be delivered by first-class mail, postage prepaid, to:

Christopher A. Duggan, Esq.
Smith & Duggan, LLP
Two Center Plaza
Boston, Massachusetts 02108-1906

Dana M. Richens, Esq.
Smith, Gambrel & Russell, LLP
Promenade II, Suite 3100
1230 Peachtree Street, N.E.
Atlanta Georgia 30309-3592

_____
Brian P. McDonough

741473.1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| DUNKIN' DONUTS INCORPORATED, | ) | |
| a Delaware Corporation, | ) | |
|  | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 02-11639-RGS |
|  | ) | |
| COELHO'S COFFEE SHOP, INC., | ) | |
| a Massachusetts corporation, | ) | |
| CESAR F. COELHO, and | ) | |
| ANGELA COELHO, | ) | |
| Residents of Massachusetts | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

**CONSENT ORDER**

IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff Dunkin'

Donuts Incorporated and Defendants Coelho's Coffee Shop, Inc., Cesar F. Coelho, and Angela

Coelho (hereinafter "Defendants") that Plaintiff's Motion for a Preliminary Injunction is

resolved upon the following terms and conditions:

      1.     Plaintiff's Motion for a Preliminary Injunction is granted to the extent agreed to

herein.

      2.     Defendants shall cure the violations at their Dunkin' Donuts shop located at 438-

454 Main Street, Route 28, Dennisport, Massachusetts 02639 as identified in the Critical Food

Safety and Sanitation Inspection and Store Standards Inspection forms dated October 21, 2002,

copies of which are attached hereto, collectively, as Exhibit 1, by no later than Friday, November

1, 2002.

      3.     Defendants' execution of this Consent Order and agreement to cure the violations

referenced in Paragraph 2 above shall not constitute an admission that those violations actually

existed at its shop on the date in question.

      4.     Plaintiff's claim for its attorneys' fees and costs remains pending.



SIGNED AND ENTERED this 30th day of October, 2002.

*[signature]*

RICHARD G. STEARNS
United States District Court Judge


Respectfully submitted,


*[signature]*                                    *[signature]*

Robert A. Murphy, BBO #363700          James W. Savage, BBO #442980
CASNER & EDWARDS, LLP                  Law Office of James W. Savage
303 Congress Street                    44 Byfield Road
Boston, Massachusetts 02210            Newton, Massachusetts 02468
Telephone:  (617) 426-5900             Telephone:  (617) 964-0090
Facsimile:  (617) 426-8810             Facsimile:  (617) 969-1478

Robert L. Zisk (RZ 1275)               Attorney for Defendants
David E. Worthen (DW 8519)
Roland B. Ninomiya (RN 6381)
Schmeltzer, Aptaker & Shepard, P.C.
2600 Virginia Avenue, N.W.
Suite 1000
Washington, D.C. 20037
Telephone:  (202) 333-8800
Facsimile:  (202) 625-3311


Attorneys for Plaintiff

Dated:  October 29, 2002

*A22264*

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LORO LO-LAJA KUJJO | ) | CIVIL ACTION NO. 02-1047RGS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CEPHALON, INC., WALGREEN | ) | |
| EASTERN COMPANY, INC. , | ) | |
| AND DR. KENNETH C. | ) | |
| SASSOWER, M.D. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ANSWER AND JURY CLAIM OF THE DEFENDANT, KENNETH C. SASSOWER, M.D. TO THE PLAINTIFF'S AMENDED COMPLAINT

Now comes the defendant, Kenneth C. Sassower, M.D. and pursuant to Rule 12(a) of the Federal Rules of Civil Procedure, responds to the Plaintiff's Amended Complaint paragraph by paragraph as follows:

1.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 1 of the Plaintiff's Amended Complaint.

2.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 2 of the Plaintiff's Amended Complaint.

3.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 3 of the Plaintiff's Amended Complaint.

4.  .    The defendant admits the allegations made in paragraph 4 of the Plaintiff's Amended Complaint.

5.      Paragraph 5 of the Plaintiff's Amended Complaint calls for a conclusion of law, to which no response is required.  In further answering paragraph no. 5 of the Plaintiff's Amended Complaint, the defendant states that this court does not have jurisdiction over him.

6.      Upon information and belief, the defendant admits the allegations made in paragraph 6 of the Plaintiff's Amended Complaint.

7.    The defendant is without knowledge or information sufficient to form belief as to the truth or accuracy of the allegations made in paragraph 7 of the Plaintiff's Amended Complaint.

8.    Paragraph 8 of the Plaintiff's Amended Complaint does not set forth any allegations of fact, and as such, no response by this defendant is required.

9.    Answering the allegations made in paragraph 9 of the Plaintiff's Amended Complaint, the defendant admits that he did prescribe Provigil for the plaintiff.

10.    The defendant is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 10 of the Plaintiff's Amended Complaint.

11.    The defendant is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 11 of the Plaintiff's Amended Complaint.

12.    Answering the allegations made in paragraph 12 of the Plaintiff's Amended Complaint, the defendant admits that Provigil was prescribed for the plaintiff to address his sleep disorder. The defendant is without knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations contained in paragraph 12 of the Plaintiff's Amended Complaint.

13.    The defendant denies the allegations made in paragraph 13 of the Plaintiff's Amended Complaint.

14.    The defendant is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations made in paragraph 14 of the Plaintiff's Amended Complaint.

15.    The defendant denies the allegations made in paragraph 15 of the Plaintiff's Amended Complaint.

16.    The defendant denies the allegations made in paragraph 16 of the Plaintiff's Amended Complaint.

17.    Answering the allegations made in paragraph 17 of the Plaintiff's Amended Complaint, the defendant states that the product information sheet dispensed with Provigil speaks for itself.

18.    Answering the allegations made in paragraph 18 of the Plaintiff's Amended Complaint, the defendant states that the product information sheet dispensed with Provigil speaks for itself.

19.     The defendant denies the allegations made in paragraph 19 of the Plaintiff's Amended Complaint.

20.     The defendant is without knowledge or information to form a belief as to the truth or accuracy of the allegations made in paragraph 20 of the Plaintiff's Amended Complaint.

21.     The defendant denies the allegations made in paragraph 21 of the Plaintiff's Amended Complaint.

22.     The defendant denies the allegations made in paragraph 22 of the Plaintiff's Amended Complaint.

23.     The defendant denies the allegations made in paragraph 23 of the Plaintiff's Amended Complaint.

24.     The defendant denies the allegations made in paragraph 24 of the Plaintiff's Amended Complaint.

25.     The defendant denies the allegations made in paragraph 25 of the Plaintiff's Amended Complaint.

26.     The defendant denies the allegations made in paragraph 26 of the Plaintiff's Amended Complaint.

27.     The defendant denies the allegations made in paragraph 27 of the Plaintiff's Amended Complaint.

28.     The defendant is without knowledge or information sufficient to form belief as to the truth or accuracy of the allegations made in paragraph 28 of the Plaintiff's Amended Complaint.

29.     The defendant is without knowledge or information sufficient to form belief as to the truth or accuracy of the allegations made in paragraph 29 of the Plaintiff's Amended Complaint.

30.     The defendant denies the allegations made in paragraph 30 of the Plaintiff's Amended Complaint.

31.     The defendant denies the allegations made in paragraph 31 of the Plaintiff's Amended Complaint.

3

32.     Paragraph 32 of the Plaintiff's Amended Complaint does not contain any allegations of fact. Consequently, no response is required. To the extent that paragraph 32 is construed to include any allegations of fact, the defendant denies said allegations.

33.     The defendant denies the allegations made in paragraph 33 of the Plaintiff's Amended Complaint.

34.     Paragraph 34 of the Plaintiff's Amended Complaint does not contain any allegations of fact. Consequently, no response is required.

35.     The defendant denies that he has received a "settlement proposal."

36.     Paragraph 36 of the Plaintiff's Amended Complaint does not contain any allegations or facts. Consequently, no response is required. To the extent that paragraph 36 is construed to contain any allegations of fact, the defendant denies said allegations.

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim against the defendant upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The plaintiff is barred from recovery since the negligence of the plaintiff was equal to or greater than any negligence of the defendant as alleged in the Complaint.

### THIRD AFFIRMATIVE DEFENSE

If the plaintiff was damaged as alleged in the Complaint, any such damage was the result of acts or omissions of persons or entities over which the defendant had no control and for whose conduct the defendant is not legally responsible.

### FOURTH AFFIRMATIVE DEFENSE

The plaintiff having been informed of the risks involved consented to the medical procedures.

### FIFTH AFFIRMATIVE DEFENSE

Any recovery by the plaintiff is controlled by the Medical Malpractice Statute.

4

## SIXTH AFFIRMATIVE DEFENSE

The claims set forth in the Plaintiff's Complaint are barred by the applicable Statute of Limitations.

## SEVENTH AFFIRMATIVE DEFENSE

This court lacks personal jurisdiction over the defendant, Sassower.

## EIGHTH AFFIRMATIVE DEFENSE

This court lacks subject matter jurisdiction over the defendant, Sassower.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Amended Complaint should be dismissed for insufficiency of service of process.

## TENTH AFFIRMATIVE DEFENSE

The Plaintiff's Complaint should be dismissed for insufficiency of process.

WHEREFORE, the defendant respectfully requests that this court issue an order dismissing the Plaintiff's Amended Complaint and awarding him his reasonable attorney's fees and costs incurred in the defense of this action.

## JURY CLAIM

The defendant demands a trial by jury to the fullest extent permitted by law.

The Defendant,
Dr. Kenneth C. Sassower
By her attorneys,

Curtis R. Diedrich, BBO#555937
Sloane & Walsh, LLP
Three Center Plaza
Boston, MA 02108
(617) 523-6010

Date: 10/19/02

## CERTIFICATE OF SERVICE

I, Curtis R. Diedrich, attorney for the defendants, hereby certify that I have this _17_

day of _October_ ,2002, served a copy of the attached upon all interested parties, by mailing a

copy of same, postage prepaid, directed to:

Loro Lo-Laja Kujjo, Pro Se
250 Kennedy Drive #610
Malden, MA 02148

Bruce H. Murray, Esq.
Lynch & Lynch
45 Brisdol Drive
So. Easton, MA 02375

Richard B. Kirby, Esq.
Lecomte, Emanuelson & Doyle
1250 Hancock Street
Quincy, MA 02169

Curtis R. Diedrich

S:\KUJJO, LORO LO-LAJA V. SASSOWER, KENNETH, M.D. - RM-360-6449\PLEADINGS\Answer to Amended Complaint.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LORO LO-LAJA KUJJO | ) | CIVIL ACTION NO. 02-1047RGS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CEPHALON, INC., WALGREEN | ) | |
| EASTERN COMPANY, INC. , | ) | |
| AND DR. KENNETH C. | ) | |
| SASSOWER, M.D. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ANSWER AND JURY CLAIM OF THE DEFENDANT,
KENNETH C. SASSOWER, M.D. TO THE PLAINTIFF'S
AMENDED COMPLAINT**

Now comes the defendant, Kenneth C. Sassower, M.D. and pursuant to Rule 12(a) of the

Federal Rules of Civil Procedure, responds to the Plaintiff's Amended Complaint paragraph by

paragraph as follows:

1.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy

of the allegations made in paragraph 1 of the Plaintiff's Amended Complaint.

2.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy

of the allegations made in paragraph 2 of the Plaintiff's Amended Complaint.

3.      The defendant is without knowledge sufficient to form a belief as to the truth or accuracy

of the allegations made in paragraph 3 of the Plaintiff's Amended Complaint.

4.      The defendant admits the allegations made in paragraph 4 of the Plaintiff's Amended

Complaint.

5.      Paragraph 5 of the Plaintiff's Amended Complaint calls for a conclusion of law, to which

no response is required.  In further answering paragraph no. 5 of the Plaintiff's Amended

Complaint, the defendant states that this court does not have jurisdiction over him.

6.      Upon information and belief, the defendant admits the allegations made in paragraph 6 of

the Plaintiff's Amended Complaint.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2002 OCT 18  P 2: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

PAUL GIAMBARBA,                          )
                                         )
            Plaintiff,                   )
                                         )       Civil Action No. 02-~~115550~~-RGS
      v.                                 )
                                         )              11550
GAIL GIBBONS, HARPERCOLLINS              )
PUBLISHERS INC., and                     )
SCHOLASTIC INC.,                         )
                                         )
            Defendants.                  )
                                         )

AMENDED COMPLAINT
(Plaintiff Demands Trial By Jury)

Introduction

1.      This is an action of copyright infringement, violation of the Lanham Act, and

violation of M.G.L. c. 93A arising out of defendants' wrongful conduct in using, without

plaintiff's knowledge or authorization, text and illustrations from plaintiff's copyrighted

children's book on lighthouses in defendants' later published children's book on the same subject.

Plaintiff seeks damages, injunctive relief, reasonable attorney's fees and costs.

Parties

2.      Plaintiff Paul Giambarba resides in Mashpee, Barnstable County, Massachusetts

and is a citizen of Massachusetts.

3.      On information and belief, defendant Gail Gibbons resides in Corinth, Vermont

and is a citizen of Vermont.  At all relevant times, defendant Gibbons has been engaged in the

business of writing and illustrating books for children. Ms. Gibbon's website

(www.gailgibbons.com) describes Ms. Gibbons as "America's leading children's non-fiction

author" and claims that "over 100 books that [Ms. Gibbons] ha[s] written and illustrated have

been published."

     4.     On information and belief, defendant HarperCollins Publishers Inc.

("HarperCollins") is a company incorporated under the laws of Delaware, having its principal

place of business at 10 East 53 Street, New York, New York. At all relevant times, defendant

HarperCollins has been engaged in the business of publishing books, including children's books.

In 1999, HarperCollins acquired William Morrow and Company, Inc. ("William Morrow") and

is the successor-in-interest to William Morrow. HarperCollins is a subsidiary of The News

Corporation Limited. HarperCollins's website (www.HarperCollins.com) states that it "is a

broad-based publisher with strengths in literary and commercial fiction, business books,

children's books, cookbooks, mystery, romance, religious and spiritual books," and that it "has

revenues that top $1 billion annually." The News Corporation Limited's website

(www.newscorp.com) states that it "is one of the world's largest media companies with total

assets as of March 31, 2002 of approximately US $42 billion and total annual revenues of

approximately US $15 billion."

     5.     On information and belief, defendant Scholastic Inc. is a company incorporated

under the laws of New York, having its principal place of business at 555 Broadway, New York,

New York. At all relevant times, defendant Scholastic, Inc. ("Scholastic") has been engaged in

the business of publishing books for children. Scholastic's website (www.scholastic.com) states

that Scholastic "is the largest publisher of children's books in the world" and that it is "a $2

2

billion multimedia company with 10,000 employees operating globally in education, entertainment and publishing businesses marketing to children, parents and teachers."

## Jurisdiction and Venue

6.      This action arises under:  the copyright laws of the United States, 17 U.S.C. ∋ 501 et seq.; Section 43(a) of the Lanham Act, 15 U.S.C. ∋ 1125(a); and Massachusetts General Laws Chapter 93A.

7.      This Court has exclusive jurisdiction of the federal copyright claim by virtue of 28 U.S.C. ∋ 1338(a).  This Court has jurisdiction of the Lanham Act claim by virtue of  28 U.S.C. ∋ 1338(b) and 15 U.S.C. ∋ 1125(a).  This Court has jurisdiction of the state law claim by virtue of 28 U.S.C. ∋ 1367.

8.      This Court has personal jurisdiction over defendants because each of the defendants conducts business in Massachusetts, and because plaintiff's claims arise out of defendants' transaction of business in Massachusetts and their causing of tortious injury in Massachusetts.

9.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. ∋∋ 1400(a), 1391(b) and 1391(c).

## Facts

10.      Plaintiff Paul Giambarba has had a long career as an illustrator and writer.  He was Polaroid's first art director and, over the course of 28 years, designed Polaroid's corporate image and a substantial part of its product identity.  When not working on Polaroid designs, Mr. Giambarba did such things as freelance work for Sports Illustrated; corporate and product identity programs for Tonka Corporation and Tonka Toys; and covers and illustrations for

publishers such as Houghton Mifflin. In 1965, he began his own family publishing company,

The Scrimshaw Press, with the goal of introducing low-cost, original, illustrated paperbacks for

children dealing with Cape Cod's historical past, marine lore and ecology. Mr. Giambarba has

written and illustrated 12 books that have been published by The Scrimshaw Press.

11.     In 1968 and 1969, Mr. Giambarba wrote and illustrated, and, on or about August

1, 1969, Mr. Giambarba published through The Scrimshaw Press, a book entitled Lighthouses.

12.     The copyright page of Lighthouses bore the notice:

> Copyright ©1969 by Paul Giambarba. All rights
> reserved. No part of this book may be reproduced
> or utilized in any form or by any means without
> permission in writing from the publisher, except for
> brief passages that may be quoted in a review for a
> magazine or newspaper.

13.     On or about February 9, 1970, Mr. Giambarba applied to the United States

Copyright Office to register copyright in Lighthouses. He deposited in the Copyright Office

with his Form A application a copy of Lighthouses.

14.     The Copyright Office thereafter issued to Mr. Giambarba a Certificate of

Registration, No. A126454, dated February 9, 1970. This Certificate of Registration, reproduced

as Exhibit 1 to plaintiff's original Complaint, is incorporated herein by reference.

15.     Mr. Giambarba's foregoing book Lighthouses, reproduced as Exhibit 2 to

plaintiff's original Complaint, is incorporated herein by reference.

16.     In 1990, William Morrow, predecessor in interest to defendant HarperCollins,

published, under the Morrow Junior Books imprint, a hardcover book, purporting to have been

written and illustrated by defendant Gail Gibbons, entitled Beacons of Light: Lighthouses.

4

17.    Also in 1990, defendant Scholastic published a softcover edition of the foregoing Beacons of Light: Lighthouses. The text and illustrations in this softcover edition were identical to the text and illustrations in the hardcover book published by William Morrow.

18.    The foregoing hardcover book, Beacons of Light: Lighthouses, reproduced as Exhibit 3 to plaintiff's original Complaint, is incorporated herein by reference.

19.    Beacons of Light: Lighthouses made use of illustrations and text created by Mr. Giambarba and published in his 1969 book Lighthouses. The copied illustrations and text included, without limitation, the following:

a.    On the fourth page of Beacons of Light: Lighthouses ("BOLL"), Ms. Gibbons copied the illustration of the ship and two lifeboats in dangerous seas appearing on the second and third pages of Mr. Giambarba's Lighthouses. Also, Ms. Gibbons's accompanying text,

> Oceans and lakes have always been dangerous for sailors. Storms and howling winds can carry a ship up on a sandbar or smash it to bits against a rocky coast [,]

copied Mr. Giambarba's:

> The ocean is often dangerous. Howling winds and mountainous seas can carry a vessel up on a sand bar miles from shore and break it to bits.
>
> Waves can smash a ship against a rocky coast.

b.    On the sixth page of BOLL, Ms. Gibbons's text,

> The first guiding lights were huge bonfires that burned nightly from the tops of hills. In some places, sailors watched for landmarks, such as volcanoes, glowing in the night [,]

copied Mr. Giambarba's text on the sixth page of Lighthouses:

> The first warning lights were simply huge fires
> burned every night on the coast.
>
> Or they were landmarks such as volcanoes whose
> smoldering glow could be seen at night.

Also, Ms. Gibbons's illustration of a boat with oarsmen on <u>BOLL</u>'s sixth page copied Mr.

Giambarba's illustration of such a boat on <u>Lighthouses</u>' sixth page, and Ms. Gibbons's illustration

of a lateen rig on <u>BOLL</u>'s sixth page copied Mr. Giambarba's illustration of a lateen rig on

<u>Lighthouses</u>' eighth page.

       c.    On the eighth page of <u>BOLL</u>, Ms. Gibbons's illustration of Boston Light

with a sloop-of-war flying the Union Jack and having three human figures, copied Mr.

Giambarba's illustration having the same elements on the 14th and 15th pages of <u>Lighthouses</u>.  In

addition, Ms. Gibbons's accompanying text,

> The first lighthouse in North America was the
> Boston Light, built in 1716.  From Little Brewster
> Island, it guided sailing vessels in and out of Boston
> Harbor [,]

copied Mr. Giambarba's:

> The first lighthouse built in North America was
> Boston Light, established in 1716, on Little
> Brewster Island in Boston Harbor.

       d.    On <u>BOLL</u>'s 12th page, Ms. Gibbons's illustration of a 19th century

lighthouse lens and accompanying diagram copied respectively: (i) Mr. Giambarba's illustration

of such a lens on <u>Lighthouses</u>' 38th page and  (ii) Mr. Giambarba's diagram on <u>Lighthouses</u>' 54th

page.

       e.    On the 14th page of <u>BOLL</u>, Ms. Gibbons's text,

> The top of a lighthouse is like a giant lantern.
> Usually, a winding staircase goes to the top.  Years
> ago, the lighthouse keeper made many trips up and

> down the stairs, doing chores. The burned lamp
> wick had to be *trimmed*--or adjusted and cut off--to
> keep the lamp from smoking. Lighthouse keepers
> were sometimes called *wick trimmers* or *wickies* [,]

copied the first two sentences of Mr. Giambarba's text on the 44th page of <u>Lighthouses</u>:

> The lighthouse keeper of the old days had to make
> several trips up and down many many stairs to keep
> his lamps "trimmed." He had to cut off the burned
> wick and adjust the lamp so it would not smoke and
> dirty the lens.

And Ms. Gibbons's text on <u>BOLL</u>'s 15th page,

> Lighthouse keepers and their families were kept
> busy cleaning and polishing the lenses, shining all
> the brass in the lighthouse, and cleaning soot off the
> tower windows [,]

copied the last sentence of Mr. Giambarba's text on <u>Lighthouses</u>' 44th page:

> He [the lighthouse keeper] and his family kept busy
> cleaning the glass lenses.

      f.    On <u>BOLL</u>'s 30th page, Ms. Gibbons's text regarding the Pharos at

Alexandria and the Colossus at Rhodes,

> The first lighthouses were towers, built about 2,000
> years ago: the Pharos at Alexandria, in Egypt, and
> the Colossus at Rhodes, an island off Greece [,]

copied Mr. Giambarba's text on <u>Lighthouses</u>' eighth page:

> The first lighthouses were among the great wonders
> of the ancient world:
>
> the Pharos at Alexandria, in Egypt;
>
> the Colossus at Rhodes, an island in the
> Mediterranean off the coast of Greece.
>
> Both were built about 300 years before the birth of
> Christ.

Ms. Gibbons's copying extended even to two mistakes made in Mr. Giambarba's text: Contrary to Mr. Giambarba's text, and contrary to what Ms. Gibbons copied, the Colossus at Rhodes was <u>not</u> a lighthouse; and Rhodes was an island off the coast of Turkey, <u>not</u> Greece, as Mr. Giambarba's map, on <u>Lighthouses</u>' eighth page, shows.

20.     Defendant Gibbons used the foregoing illustrations and text, and William Morrow and Scholastic published these illustrations and text, in <u>BOLL</u> without the authorization, permission, license or knowledge of plaintiff Giambarba or anyone else at The Scrimshaw Press. Further, there is no acknowledgment, citation, or statement in <u>BOLL</u> of any kind that acknowledges the book's use of material created and copyrighted by Mr. Giambarba.

21.     Mr. Giambarba did not learn of the foregoing unauthorized use of his illustrations and text until November 1, 2001, when, by chance, he happened to come upon and read <u>BOLL</u> in a bookstore in East Sandwich, Massachusetts.  Prior to reading <u>BOLL</u> on November 1, 2001, Mr. Giambarba had no knowledge whatever of <u>BOLL</u>, and no reason to suspect that <u>Lighthouses</u> or any part thereof had been copied by the defendants or, for that matter, by anyone else.  On information and belief, part of the reason Mr. Giambarba had no knowledge of the unauthorized use of his text and illustrations in <u>BOLL</u> was because of actions taken by defendant Gibbons to fraudulently conceal such use.

22.  On information and belief, both the hardcover and softcover editions of <u>BOLL</u> have been published, marketed and sold by the defendants continuously since 1990, and are still being published, marketed and sold today.

<u>Claims</u>

COUNT I
<u>Copyright Infringement</u>

8

23.    Plaintiff repeats and realleges each of the preceding paragraphs of this Complaint.

24.    By printing, publishing, distributing and selling <u>BOLL</u>, a book that uses Mr. Giambarba's copyrighted work without authorization or license, HarperCollins and Scholastic have infringed Mr. Giambarba's exclusive rights under the Copyright Act in violation of 17 U.S.C. §§106 and 501(a).  And, by using Mr. Giambarba's copyrighted work in her manuscript for <u>BOLL</u> without Mr. Giambarba's authorization or license, Ms. Gibbons has also infringed Mr. Giambarba's exclusive rights under the Copyright Act.  In addition, on information and belief, Ms. Gibbons has aided and abetted the continuing infringement of Mr. Giambarba's rights under the Copyright Act by defendants Harper Collins and Scholastic.

25.    Further, the conduct of Ms. Gibbons has constituted a continuing, willful infringement within the meaning of 17 U.S.C. §504(c)(2).

COUNT II<br><u>Violation of Lanham Act</u>

26.    Plaintiff repeats and realleges paragraphs 1 through 22 of this Complaint.

27.    Defendants have caused <u>BOLL</u> to be published, marketed, distributed and sold without any credit to Mr. Giambarba and with the implication that no illustrations and no text authored by Mr. Giambarba have been used in <u>BOLL</u>.  Instead, <u>BOLL</u> credits Ms. Gibbons not only for her own text and illustrations but also for text and illustrations authored by Mr. Giambarba.  The foregoing have constituted false and misleading designation of authorship in violation of 15 U.S.C. § 1125(a).

28.    Further, Ms. Gibbons has promoted herself and her other books through her website and, on information and belief, in other ways, by falsely claiming, implicitly and

9

explicitly, that <u>BOLL</u> was entirely her own work. And, on information and belief, Ms. Gibbons

has made the misrepresentation described in paragraph 33.b. below.

29.     The foregoing false and misleading designations of authorship have unjustly

enriched defendants, and have caused damage to Mr. Giambarba.

COUNT III
Violation of Massachusetts General Laws c.93A

30.     Plaintiff repeats and realleges each of the preceding paragraphs of this Complaint.

31.     Mr. Giambarba has at all relevant times been engaged in the conduct of trade or

commerce.

32.     Ms. Gibbons, HarperCollins (and its predecessor-in-interest William Morrow) and

Scholastic have at all relevant times been engaged in the conduct of trade or commerce.

33.     Defendants' acts have constituted, and are continuing to constitute, unfair methods

of competition, and unfair and deceptive acts and practices, in violation of M.G.L. c.93A §2.

This claim by plaintiff under M.G.L. c. 93A §2 is not preempted by 17 U.S.C. §301(a) because,

in addition to being based on defendants' unauthorized copying, reproduction and distribution of

plaintiff's copyrighted work, plaintiff's c. 93A claim is based on the following:

a.     On information and belief, defendants have, in their marketing and advertising of

<u>BOLL</u>, falsely represented that <u>BOLL</u> is entirely the work of Ms. Gibbons and have falsely

implied that no illustrations and no text authored by Mr. Giambarba have been used in <u>BOLL</u>, in

spite of the fact that Ms. Gibbons has, at all relevant times, well known that such representation

and such implication are false. Marketing and advertising incorporating such false

representation and false implication have included Ms. Gibbons's promotion of herself and her

work on her website, in which Ms. Gibbons has described herself as "America's leading

10

children's non-fiction author," an author who writes non-fiction books because she "love[s] researching so much," and the writer and illustrator of "over 100 [published] books" including BOLL. Given her plagiarism of Mr. Giambarba's work, Ms. Gibbons's description of herself in the foregoing ways constitutes a material misrepresentation of fact in violation of, among other things, 940 C.M.R. §6.04(1) because Ms. Gibbons "knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading."

        b.      On information and belief, after receiving the Complaint in this action, Ms. Gibbons made knowingly false representations to her counsel with the intent that such representations be communicated by her counsel to Mr. Giambarba's counsel and the Court, all with the intent of : (i) deterring Mr. Giambarba from pursuing this action; (ii) convincing this Court to enter judgment against Mr. Giambarba; (iii) concealing her plagiarism; (iv) allowing her to continue to reap royalties from BOLL undisturbed; and (v) allowing her to continue to profit from her self-promotion as "America's leading children's non-fiction author," an author who "love[s] researching," and the writer and illustrator of "over 100 [published] books." On information and belief, these knowingly false representations by Ms. Gibbons included, without limitation, that:

        i.      The first time Ms. Gibbons ever saw Mr. Giambarba's Lighthouses was allegedly after she was served with the Complaint in this action when she got the book through Amazon.com.

        ii.      The mistakes that appear in BOLL regarding the Colossus of Rhodes being a lighthouse, and regarding Rhodes being an island off the coast of Greece, rather than Turkey, were mistakes Ms. Gibbons allegedly made not because she copied them from Mr. Giambarba's

Lighthouses but rather because she copied the mistakes from an encyclopedia in a local library close to her home in Vermont.

34.    As a result of defendants' foregoing acts, Mr. Giambarba has suffered a loss of money and property.  Among other things, Mr. Giambarba has been damaged by the knowing misrepresentations described in Paragraph 33.b. above because such misrepresentations have served to perpetuate defendants' continuing infringement of Mr. Giambarba's work and have served to delay Mr. Giambarba's obtaining from the defendants the relief to which he is entitled.

35.    Some or all of defendants' violations of M.G.L. c.93A §2 have been willful or knowing violations.

Prayer for Relief

WHEREFORE, plaintiff demands that:

1.    Defendants, and those in active concert or participation with them, be preliminarily and permanently enjoined from infringing plaintiff's copyright;

2.    Defendants be ordered to take such affirmative measures as are appropriate to correct and redress their past infringement of plaintiff's copyright;

3.    Defendants be required to account for and to pay plaintiff all profits derived by defendants from their acts of infringement;

4.    In addition to such profits, defendants be required to pay plaintiff such damages as plaintiff has sustained as a result of defendants' acts of infringement;

5.    In the alternative to 3 and 4 above, and if plaintiff so elects, defendants be required to pay statutory damages to plaintiff pursuant to 17 U.S.C. §§ 412, 504(c)(1) and 504(c)(2) and reasonable attorney's fees pursuant to 17 U.S.C. § 505;

12

6.     Defendants be preliminarily and permanently enjoined from making false or misleading designations of the authorship of <u>Beacons of Light: Lighthouses</u>;

7.     Defendants be ordered to take such affirmative measures as are appropriate to correct and redress their past false and misleading designations of the authorship of <u>Beacons of Light: Lighthouses</u>;

8.     Defendants be required to pay plaintiff such profits as defendants have derived and/or such damages as plaintiff has sustained as a result of defendants' false and misleading designation of the authorship of <u>Beacons of Light: Lighthouses</u>;

9.     Defendants be required to pay plaintiff damages on account of their violation of M.G.L. c.93A §2;

10.     Defendants be required to pay plaintiff his costs, reasonable attorney's fees, and treble damages pursuant to 15 U.S.C. §1117(a) and M.G.L. c.93A § 11; and

11.     Plaintiff have such other and further relief as the Court may deem appropriate.


## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.


Dated:    October 18, 2002

David J. Fine, BBO #165120
Law Offices of David J. Fine
3 Center Plaza, Suite 400
Boston, MA  02108-2003
(617) 720-2941

Attorney for Plaintiff

13

## Certificate of Service

I hereby certify that I have this day served the foregoing by causing true copies thereof to be sent by telecopier and mail, first class postage prepaid, to defendants' counsel Dori Ann Hanswirth, Hogan & Hartson LLP, 875 Third Avenue, New York, NY  10022 and Elizabeth A. Ritvo, Brown Rudnick Berlack Israels, LLP, One Financial Center, Boston, MA  02111.

Dated:   October 18, 2002

David J. Fine

14

<u>Broadcasting System</u>, 94 F.R.D. 292, 294 (S.D.N.Y.1982).

In accordance with the above, Plaintiff respectfully alleges as follows:

<u>Jurisdiction</u>

1)    Jurisdiction is conferred by 28 U.S.C. 1331, as this action arises under the laws of the United States. Jurisdiction is further conferred by 28 U.S.C. 1343(a)(4) as this action is brought to recover damages or to secure equitable or other relief under an Act of Congress providing for the protection of civil rights.

<u>Parties</u>

2)    The Plaintiff, R. Messac ("Messac"), is a resident of the Commonwealth of Massachusetts, Middlesex County.

3)    The Defendant, Commonwealth of Massachusetts, Department of Mental Retardation, Walter E. Fernald Developmental Center (hereinafter "DMR" or "Fernald"), is a residential treatment facility for mentally retarded adults located in Waltham, Massachusetts.

4)    The Defendants, Benison and Morrissey, are sued herein only in their Official capacities as above captioned, and only under Count I herein.

Page 2 of  14

Facts

5)   Messac is a black American, her country of national origin
     is Haiti, and she resides in the Commonwealth of
     Massachusetts, Middlesex County.

6)   In January, 2001, Messac, with the aid of undersigned
     counsel, won a Jury trial in federal court, Boston,
     Massachusetts, No. 98-10297-RGS as against the DMR.

7)   The Jury held that an illegal racially hostile environment
     had existed at the Fernald for years continuing into 1997.

8)   The exclusive theory upon which Messac's victory was based
     was Title VII to the 1964 **Civil Rights** Act, 42 U.S.C. 2000e.

9)   Messac was there awarded thirty-five thousand dollars
     ($35,000.00) as and for emotional distress by the Jury.

10)  The District Court thereafter approved attorney's fees in
     the amount of Thirty-Seven Thousand One Hundred Twenty
     Dollars ($37,120.00), then issuing an Order to that effect.

11)  A not insubstantial portion of the evidence which the Jury
     heard at trial was that other blacks and/or those of Haitian
     national origin who were employed at the Fernald School had,
     similar to Messac, for years been treated in a hostile and
     discriminatory manner by white management on account of
     their race, color, and/or national origin.

12)  Evidence was similarly presented at the trial that some of
     those same victims who were systematically discriminated

against were also retaliated against whenever they made complaints to white Fernald management as to illegal discrimination.

13) Evidence was similarly presented at the trail that upwards of One Hundred Fifty (150) Black and/or Haitian national origin Fernald staff had stagged a protest march from Waltham to the Massachusetts Statehouse in Boston in June 1997.

14) The March was entitled "End Racism at the Fernald", and it received substantial media coverage at that time.

15) Trial Exhibit 17, Exhibit "A" attached hereto, is a redacted version of the so called "Romney Report", which was presented to the Jury in its redacted form.

16) The Report had substantially sugar coated the fact that there were longstanding systemic racial inequities and problems at the Fernald, and it otherwise went to great lengths to avoid any racially charged conclusions which could be used as against the School, and the Report otherwise lacked objectivity due to the over application of political correctness to its conclusions.

17) The Report had been commissioned and paid for by the DMR itself in a knee jerk response to the above March which had brought, temporarily at least, political and media pressure to bear on the School. See Exhibit "B" hereto.

18) Despite its obvious bias and flaws, the said Report
    nonetheless still indicated that racial "insensitivity" had
    been for years and continued to then be a problem at the
    Fernald.

19) At all times, and including at trial and on "Appeal", the
    School was represented by the civil division of the
    Commonwealth of Massachusetts, Office of the Attorney
    General, at the expense of the taxpayers of the Commonwealth
    of Massachusetts.

20) The Defendant, Fernald, then filed and lost its Post Trial
    Motion to have the Verdict overturned.

21) Within the said Motion, the AG's Office, then acting as
    Authorized binding Agents of the DMR, had materially
    misrepresented the trial record to the Court, and this fact
    was pointed out by the Court in its said Order Denying the
    Motion.

22) After the said Denial, and no earlier than on the last
    theoretically possible day to Appeal, the DMR, through the
    Attorney General's Office, then filed a groundless Appeal so
    as to forestall payment of the judgment and the fees.

23) After a solid year of continued delays begged of the Circuit
    Court by the Defendant, the said Appeal was thereafter
    "withdrawn" by the DMR in May 2002.

24) The DMR through the AG's Office had previously represented

to the Court in May 2001 in writing that "the Commonwealth is willing and able to pay the subject judgment when and if it is affirmed by the First Circuit Court of Appeals".

25) This express representation was made within the Defendant's then Motion for a Stay (of the execution and payment of attorney's fees).

26) When pressed by the undersigned to finally pay up in May 2002, the DMR then claimed that it had not the money to pay, despite the above said prior representation to the Court.

27) The DMR, rather than pay out of its own budget, then requested through the Defendant, Comptrollers Office, that payment be made from the so called "Settlement and Judgments Fund".

28) In so doing, the DMR submitted to the Comptroller's Office Exhibit "C" attached hereto.

29) Based upon representations made within Exhibit "C", the Legislature then appropriated the money, and the same was included within the so called "Supplemental Budget", Chapter 300 of the Acts of 2002, which was signed by the Governor on August 30, 2002.

30) Title VII of the 1964 Civil Rights Act requires that true and accurate records of the existence of unlawful employment practices (including precisely those which the Jury found to exist in the above mentioned Messac trial) be accurately

created and maintained by the Employer, (in this instance) the Commonwealth. *See* 42 U.S.C. 2000e - 8(c); *see also* <u>United States of America v. State of New Hampshire</u>, 539 F.2d 277 (1st.Cir.1976), a copy of which is attached hereto as Exhibit "D".

31) The Public Interests at large, including Messac's interests as a Public Citizen, similarly command that a Public entity such as the Commonwealth **not** misrepresent the nature of the above said **CIVIL RIGHTS** violation in any respect in any Public Record, let alone in one which is specifically used to obtain appropriations from the Legislative arm of the Government to pay its monetary obligations caused by its violation of federal civil rights laws.

32) Notwithstanding the above, Exhibit "C" is an overt misrepresentation of the nature of the loss in the Messac matter.

33) The Messac case could only, as a matter of law, be classified as a CIVIL RIGHTS case, not a "personnel" matter as so indicated in Exhibit "C", because Title VII **TO THE 1964 *CIVIL RIGHTS* ACT** was the only theory even plead therein.

34) The DMR and the Official Capacity Defendants, directly and impliedly, have now taken the basis devoid position that the above mentioned case was not "CIVIL RIGHTS" and that it was

therefore legitimized in so masking the nature of the loss
(and, consequentially, the hiding of the nature of the state
of racism at the Fernald).

35) The above positions taken by all Defendants, amount to an
aiding and abetting of each other's intentional mis-
categorization of the nature of the loss in a Public record.

36) The above position taken by the Authorized Agent of the
Defendants' herein, the Attorney General of this State,
clearly create a conflict of interest, and is otherwise
wholly inconsistent with the Attorney General's statutory
and ethical obligation to prosecute racism wherever and
whenever it uncovers the same, and with its ethical, moral,
and legal obligation to insure that all Public Records in
this Commonwealth, particularly those unlawful employment
practices detailed under Title VII herein, are duly recorded
and preserved as true and accurate.

37) The complete unreasonableness and utter lack of credibility
of the above said "position" taken by the Parties hereto, as
a matter of law, allows an inference of pretext as to the
real motive of the Parties in so misrepresenting the nature
of the loss.

38) The above said pretext in turn allows a permissible
inference that the Official Capacity Defendants, and the DMR
under Title VII (Count II), possess an invidiously

Page 8 of 14

discriminatory animus generally as against blacks / Haitians, against those who testify against the Commonwealth as to racism, and as against Messac specifically in these same regards, whereby they willingly risk the potential obstruction of justice which the said misinformation in the State's Public Records may well cause in the future.

39) Namely, since evidence of the DMR's prior civil rights record is relevant to liability, as it was in the above detailed trial, in any future race based action against it the disinformation thus created as above could potentially allow the Defendants to answer "no" to interrogatories or Deposition testimony directed to them inquiring as to whether they have any "civil rights" verdicts against them.

40) The above pretext created by the DMR's baseless delays and other above efforts to avoid payment, by its authorized misinformation to the Court in post trial filings, and by its position as above mis-characterizing the nature of the lawsuit, all allow a **permissible inference** that any and all of the Defendant's  motive was to retaliate against Messac for her filing the case, her testifying therein, and for her embarrassing the Commonwealth in federal court as she did by proving that racism is prevalent within the DMR / Fernald, arms of the Commonwealth.

41) The act of illegally hiding the nature of a civil rights

defeat is, as a matter of law, an act of racism, because the
same encourages further racism by intentionally obliterating
any potential deterrent effect which publication of the
CIVIL RIGHTS nature of the judgment may have otherwise had
as against the Management at the DMR who knowingly allowed
the racism to fester in the first place.

42) The Comptroller's Office had actual knowledge that Exhibit
"C" was fraudulent when submitted to it by the DMR, because
it had previously acknowledged in Exhibit "E", through its
own "General Counsel" no less, the truism that the payment
was for a **Title VII CIVIL RIGHTS VIOLATION,** id., yet it
later supported its request for payment with a document it
knew to be completely false.

43) The above conduct is an affront to the Public Interest at
large and has damaged Messac in her individual capacity as
well, as she too is a member of the Public, and she has
otherwise been individually damaged emotionally and through
denying her the recognition she deserves, in Public Records
and otherwise, for finally successfully exposing racist
practices of the Commonwealth at the DMR / Fernald, and the
continuance to this day of hiding the truth from the Public
citizens of this Commonwealth and from giving Messac her
accurate just deserts in the public record, is a continuing
violation of Title VII because the same is the exact

opposition of the swift remedial action required under Title
VII once it is clear that an unlawful employment practice
has occurred.

44) As a Public citizen of this Commonwealth, Messac has
standing in her own right to allow the Court to Order the
Commonwealth to correct this misrepresentation of the Public
Record, and to further Enjoin this practice in the future,
and to further pursue whether this practice of mis-
characterizing its civil rights losses has occurred in other
situations whether or not in specific violation of 42 U.S.C.
2000e - 8(c) as above.


### COUNT I
### Mandatory Prospective Injunctive Relief, 42 U.S.C. 1983.
### Official Capacity Defendants


45) Messac adopts by reference all above allegations, and
further alleges:

46) Defendants were acting under color of State law.

47) Defendants conspired to deprive Messac of the equal
protection of the laws.

48) Defendants conspired to retaliate as against Messac for her
assertion of speech on matters of Public concern as against
the Commonwealth at her trial and otherwise as set forth
herein.

49) Defendants conspired to prevent Public access to the fact

that the Commonwealth, and the DMR has been held in
violation of federal civil rights laws.

50)  Defendants' conduct as above has deprived Messac and the
Public Citizens of this Commonwealth of their unquestioned
right to free access to accurate information clearly of
their concern as both voting taxpayers who have footed the
bill for the racist conduct of the DMR which caused the
verdict in the first place, and as Citizens of this
Commonwealth who otherwise have an unequivocal right to see
how it is that their government spends the tax revenues that
they pay.


WHEREFORE, the Plaintiff, R. Messac, requests that:

A)  this Court Order that the Public Record be corrected to
reflect the true nature of the reason for payment as above
in the Messac action;

B)  this Court permanently enjoin the Official Capacity
Defendants from any future acts of misrepresenting the
nature of Civil Rights trial losses by Agencies of this
Commonwealth;

C)  this Court Order the Defendant, Comptroller, to produce all
records of payments for judgments over the last ten years
(including all so called "Requests for Payment" forms as
detailed above) within thirty days hereof, and, for each

such judgment, to state the precise nature of the same and the theories upon which each judgment was based;

D)  this Court Order the Official Capacity Defendants to produce all records of unlawful employment practices pursuant to 42 U.S.C. 2000e - 8(c) over the last ten years for which payment has been requested from the Legislature, and

E)  Order such other relief as it deems fit, including attorneys fees.


## COUNT II
### Title VII Of the 1964 Federal Civil Rights Act
### 42 U.S.C. 2000e, as Amended.


49) Messac adopts by reference all above allegations, and further alleges:

50) All conditions precedent regarding this Count have been complied with, this action having grown out of the prior filing before the EEOC of Messac.

51) The above described acts as against Messac were in reprisal for her protected activities, including the filing of her lawsuit, her testifying therein, and for winning the lawsuit.

WHEREFORE, the Plaintiff, R. Messac, demands judgment against the

Defendant, The Commonwealth of Massachusetts, Department of

Mental Retardation, Fernald Developmental Center, in an amount

which fairly and reasonably compensates her for her damages,

together with interest, reasonable attorney's fees, and the costs

of this action.

**THE PLAINTIFF DEMANDS A TRIAL BY Jury UPON ALL *legal* COUNTS**

                    Respectfully submitted,
                    R. Messac
                    By her attorneys,


I hereby certify that a true copy of the within
document was served upon all pro se parties/
attorneys of record by hand/first class mail,
postage prepaid, on _____

                    _____
                    Matthew Cobb, BBO NO. 556677
                    Law Office of Matthew Cobb
                    101 Tremont Street
                    Boston, Massachusetts   02108
                    (617) 357-7300


                    _____
                    Paul F. Wood, BBO NO. 565195
                    Law Office of Paul F. Wood
                    101 Tremont Street
                    Boston, Massachusetts   02108
                    (617) 482-9300


Page 14 of  14